IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

MARY MARGARET CARDIN )
)
v. ) No. 2:13-0037
) Judge Nixon/Bryant
SOCIAL SECURITY ADMINISTRATION )

To:    The Honorable John T. Nixon, Senior Judge

REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. §§ 405(g) and 1383(c), to obtain judicial review of the final decision of the Social Security Administration ("SSA" or "the Administration") denying plaintiff's applications for disability insurance benefits and supplemental security income, as provided under Titles II and XVI of the Social Security Act. The case is currently pending on plaintiff's motion for judgment on the administrative record (Docket Entry No. 13), to which defendant has responded (Docket Entry No. 21). Upon consideration of these papers and the transcript of the administrative record (Docket Entry No. 11),[1] and for the reasons given below, the undersigned recommends that plaintiff's motion for judgment be DENIED and that the decision of the SSA be AFFIRMED.

I. Introduction

Plaintiff filed her applications for benefits in October 2009, alleging disability onset as of September 10, 2005, due to chronic obstructive pulmonary disease (COPD), back

---

[1]Referenced hereinafter by page number(s) following the abbreviation "Tr."

problems, and pain in her feet and legs. (Tr. 24, 197) Her applications were denied at the initial and reconsideration stages of state agency review. Plaintiff subsequently requested *de novo* review of her case by an Administrative Law Judge (ALJ). The case came to be heard by the ALJ on May 31, 2011, when plaintiff appeared with counsel and gave testimony. (Tr. 41-70) At the conclusion of the hearing, the ALJ took the matter under advisement until October 28, 2011, when he issued a written decision finding plaintiff not disabled. (Tr. 24-35) That decision contains the following enumerated findings:

1. The claimant meets the insured status requirements of the Social Security Act through September 30, 2009.

2. The claimant has not engaged in substantial gainful activity since September 10, 2005, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairment: Borderline Intellectual Functioning (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except she has marginal literacy; and she should avoid strong fumes, excessive dust and temperature extremes in the workplace. Mentally, she requires simple repetitive tasks.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on August 15, 1963 and was 42 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from September 10, 2005, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 26, 29, 31, 33-34)

On April 2, 2013, the Appeals Council denied plaintiff's request for review of the ALJ's decision (Tr. 11-14), thereby rendering that decision the final decision of the Administration. This civil action was thereafter timely filed, and the court has jurisdiction. 42 U.S.C. §§ 405(g), 1383(c). If the ALJ's findings are supported by substantial evidence, based on the record as a whole, then those findings are conclusive. Id.

## II. Review of the Record

The following record review is taken from defendant's brief, Docket Entry No. 21 at pp. 3-11:

A. <u>Age, Education and Work Experience</u>

Plaintiff, born on August 15, 1963 (Tr. 133), was 42 years of age at the time of her alleged onset of disability on September 10, 2005, and would be classified as a "younger

3

individual" under the disability regulations. See 20 C.F.R. §§ 404.1563, 416.963. She has a ninth grade education and attended some special education classes (Tr. 30, 270-71). She has past relevant work experience as a cleaner/housekeeper, hand sander, and presser (Tr. 33, 64).

B. <u>Vocational Evidence</u>

Katherine Bradford testified as a vocational expert (VE) at the hearing (Tr. 63-70). The VE testified that plaintiff's past relevant work as a cleaner/housekeeper, a hand sander, and a presser was light and unskilled work (Tr. 64). The ALJ asked the VE, in accordance with the residual functional capacity, to assume a hypothetical person of plaintiff's age, education, and work experience who was able to perform a limited range of medium exertional work that involved the avoidance of strong fumes, excessive dust, extremes of temperature, and involved simple repetitive tasks, would that individual be able to perform any other work aside from her past relevant work (Tr. 63-64). The VE testified that such a hypothetical person would be able to perform the occupations of production laborer, inspector, and machine tender (Tr. 34, 65).

C. <u>Medical Evidence</u>

During 2000 to 2011, plaintiff received sporadic treatment for bronchitis. Plaintiff was diagnosed with bronchitis five times during the period from 2000 to her alleged disability onset date of September 10, 2005. Plaintiff was diagnosed with bronchitis in June 2000 (Tr. 415), March 2001 (Tr. 402), March 2002 (Tr. 401), October 2003 (Tr. 393), and July 2004 (Tr. 284). After her alleged disability onset date of September 10, 2005, plaintiff was diagnosed with bronchitis four times. Plaintiff was diagnosed with bronchitis in March 2008 (Tr. 327), December 2008 (Tr. 322), October 2009 (Tr. 318), and February 2011 (Tr. 347). In

4

addition to being diagnosed with bronchitis four times after her alleged disability onset date, plaintiff was diagnosed with pneumonia once in January 2010 (Tr. 367).

During 2000 to 2011, plaintiff also received treatment for neck, back, and shoulder pain. In February 2001, plaintiff complained of a sore neck and shoulder for one week (Tr. 406). Plaintiff continued to complain of neck and shoulder pain in March and April 2001 (Tr. 402, 410-11). Leonardo Rodriguez-Cruz, M.D., of Cumberland Neurological and Spinal Surgery, diagnosed plaintiff with a C6 radiculopathy (Tr. 411). Plaintiff was treated conservatively with physical therapy since her symptoms had been present for only two months, she had no weakness or reflex loss, and she was able to work (id.). She was instructed to return to Dr. Rodriguez-Cruz in one month for an assessment of whether her condition had improved or whether she would be a candidate for a nerve root decompression (id.). There is no evidence that plaintiff ever visited Dr. Rodriguez-Cruz again.

In January 2003, plaintiff complained of back pain for four days (Tr. 392). She was assessed with muscular back pain and prescribed Naprosyn and Flexeril (id.). Approximately eleven months later, in November 2003, plaintiff complained of sudden onset shoulder pain (Tr. 390). In October 2004, plaintiff complained of localized back pain for three days (Tr. 389).

The next time plaintiff apparently complained of back or neck pain was on February 10, 2010, during a consultative examination with Donita Keown, M.D. (Tr. 329-31). Plaintiff reported back pain for approximately ten to twenty years and reported that the most recent imaging of her back consisted of x-rays ten to twelve years earlier (Tr. 329).

Dr. Keown's neurological, musculoskeletal, and thoracolumbar column exams were

5

essentially negative (Tr. 331). There was no evidence of scoliotic curvature or asymmetry (id.). She displayed no muscle spasms and straight-leg raising tests were negative (id.). Strength testing was graded at 5/5 in her hands, arms, and legs (id.). She ambulated briskly without an assistive device and showed no difficulty with toe lift, heel walk, exercises, tandem step, and one-foot stand (id.). Dr. Keown opined that plaintiff's chronic low back pain was of unclear etiology since the physical exam was "without evidence for disc herniation with neural encroachment, stenosis, or other limiting lesions" (id.).

In addition to assessing plaintiff's alleged back impairment, Dr. Keown evaluated the rest of her body systems, including her pulmonary functioning (Tr. 330-31). Her lungs were clear to auscultation bilaterally, without wheezes, rales, or rhonchi (Tr. 330). Dr. Keown reported that she was not short winded at any time during the evaluation (Tr. 331). Dr. Keown's impression was that she had COPD of very mild severity, tobacco dependence, chronic low back pain of unclear etiology, and an unremarkable evaluation of the lower extremities and feet (id.). In a Medical Source Statement, Dr. Keown opined that plaintiff had no impairments that would limit her ability to do work-related activities (Tr. 332-37).

There are other medical reports during the relevant period (September 10, 2005 through October 28, 2011) which mention plaintiff's pulmonary functioning, aside from Dr. Keown's report, the four reports that diagnosed plaintiff with bronchitis, and the one report that diagnosed plaintiff with pneumonia. However, it appears that plaintiff did not seek treatment for respiratory difficulties until more than two years after her alleged disability onset date.

In October 2007, plaintiff visited the White County Health Department "[t]o get established for primary care" (Tr. 328). Plaintiff reported smoking one pack of cigarettes per

day and taking no medications (id.). Examination of her lungs was normal (id.).

The first time plaintiff was diagnosed with bronchitis after her alleged disability onset date was in March 2008 (Tr. 327). In October 2008, plaintiff visited White County Health Department for fibrocystic disease (Tr. 324). In January 2009, plaintiff visited Cookeville Regional Medical Center for gastroenteritis (Tr. 287-99). A respiratory exam was normal (Tr. 288). She had unlabored breathing, her chest was symmetrical, and her breath sounds were clear (id.). She denied respiratory problems (id.).

In May 2009, plaintiff attended a follow-up breast exam (Tr. 320). She reported smoking one to two packs of cigarettes a day for the past twenty years and a history of COPD (id.). Plaintiff received commit lozenges to assist her to stop smoking (id.).

On September 22, 2009, plaintiff attended an annual exam (Tr. 326). Although plaintiff continued to abuse tobacco, an examination of her lungs was normal (id.).

Approximately two weeks later, plaintiff was diagnosed with bronchitis after having congestion and coughing for four to five days (Tr. 317-18). Plaintiff reported smoking one half of a pack of cigarettes per day (Tr. 317).

Laboratory tests one month later, in November 2009, showed plaintiff's carbon dioxide level at 18, which was described as low by LabCorp (Tr. 301). Plaintiff's treating source, however, concluded that the lab results were normal and the only course of action recommended for plaintiff was to repeat laboratory tests yearly (id.).

Less than two months later, plaintiff visited White County Community Hospital for pain in her chest and shoulder for two days (Tr. 366). She was diagnosed with pneumonia and discharged the same day (Tr. 366-71). She stated that she was unable to afford additional treatment (Tr. 367). She reported that she was taking no medications prior to visiting the

7

hospital and that she continued to smoke one pack of cigarettes per day (Tr. 366).

The next medical report of record was issued less than six weeks later, on February 10, 2010, by Dr. Keown (Tr. 329-31). As noted above, Dr. Keown's consultative examination revealed that plaintiff's pulmonary functioning was normal (Tr. 330). Dr. Keown assessed plaintiff with only "very mild" COPD that did not impact her ability to do work-related activities (Tr. 331-37).

It appears that the next time plaintiff sought treatment was more than six months later, in September 2010, when plaintiff returned to White County Health Department complaining of nerve problems and back pain (Tr. 354-55). An examination revealed plaintiff had diminished breathe sounds throughout and lumbar point tenderness, however, straight-leg raising tests were negative (Tr. 354). She reported taking no medications and declined assistance to stop smoking (Tr. 354-55). Plaintiff received contact information for PMH and CHEER for mental health services because of her complaints of nerve problems (id.).

Two months later, on November 24, 2010, plaintiff reported that she continued to smoke one half of a pack of cigarettes per day (Tr. 350). A pulmonary exam was normal (id.). Plaintiff experienced another episode of bronchitis in February 2011 (Tr. 346-47). Plaintiff again declined assistance to quit smoking (Tr. 347).

In May 2011, plaintiff attended a consultative examination with Michael T. Cox, M.D., on referral from her attorney (Tr. 419-20). Plaintiff reported treatment for pneumonia about one year earlier at White County ER and being told during that treatment that she should reapply for disability (Tr. 419). She was smoking one half of a pack of cigarettes per day (id.). She complained of chronic shortness of breath and fatigue with minimal exertion (id.). She stated that she had inherited COPD, difficulty breathing chemicals, the inability to

8

walk more than about two blocks, wheezing, chronic non-productive cough, left leg weakness, chronic lower back pain for eleven years, and degenerative joint disease in her feet (id.). She stated she had applied for disability benefits based on the combination of COPD, pneumonia, left leg weakness, and lower back pain (id.).

Dr. Cox's physical examination revealed that plaintiff's "[l]ung fields [were] clear without any rales, rhonchi or wheezes" (id.). Plaintiff's motor strength in all four extremities, distal pulses, and sensation were intact (Tr. 420). Her reflexes were normal and equal and she had normal range of motion in her joints except for her lumbar spine (id.). She was able to stand on her toes and heels, but was unable to stand on her left foot because of pain (id.). Dr. Cox's impression was: (1) "COPD based on historical parameters," (2) left leg weakness "subjectively", and (3) status post left foot fracture with post-fracture arthritic changes in the left forefoot (id.).

Following Dr. Cox's consultative examination, Dr. Cox opined in a Medical Source Statement that plaintiff was able to occasionally lift twenty pounds and frequently lift ten pounds (Tr. 421). She could stand or walk at least two hours in an eight hour work-day (id.). She had no sitting restriction (id.). She had limited ability to push/pull in her lower extremities (Tr. 422). She periodically needed to alternate sitting and standing (id.). Dr. Cox stated that the medical findings that supported these limitations were left foot pain from osteoarthritis and left leg weakness "related to a presumed back problem" (id.).

Dr. Cox also opined that plaintiff often experienced pain severe enough to interfere with attention and concentration (id.). She is capable of tolerating no more than moderate work stress (id.). She would sometimes need to take unscheduled breaks every hour as needed (id.). She would likely be absent three days a month (id.). She has occasional postural

9

limitations due to degenerative joint disease of her left foot status post fracture (Tr. 423). She also has environmental limitations due to COPD (Tr. 424).

The final medical reports of record are by Mark Loftis, M.A., and Carolyn Valerio, Psy.D. (Tr. 427-34). They performed a consultative psychological evaluation in July 2011 (Tr. 430-34). Plaintiff reported her daily activities included helping her sister with some of the household chores, such as dishwashing, house cleaning, and laundry; going shopping with her sister; and watching a little television (Tr. 431). She was smoking about one half of a pack of cigarettes per day (id.). Her current medications were Ibuprofen and Ranitidine (id.). She denied ever receiving counseling or psychiatric care (id.).

A mental status exam revealed:

> [Plaintiff] appeared well oriented. She provided excellent historical information. She was a good personal historian. She was very cooperative and attempted all tasks presented to her. She did know the name of the current president. She appeared to be putting forth very good effort. She responded appropriately to questions. Her mood and affect were normal.

(Tr. 433).

Following the mental status exam and the administration of the Wechsler Adult Intelligence Scale (WAIS-IV) and Wide Range Achievement Test (WRAT-IV), plaintiff's general intelligence was assessed "to be in the extremely low range of intellectual functioning (FSIQ = 66). She has a functional, but limited level of literacy. A specific learning disorder is not identified. She does not appear to be delayed significantly in most areas of her adaptive functioning" (id.). Plaintiff was assessed with "a mild impairment to understand and recall instructions. Simple, repetitive tasks are not likely to be significantly [im]paired" (Tr. 434). She "has a mild impairment in concentration skills, persistence and ability to maintain

a competitive pace" (id.). She "has no real problems with social interactions. It is believed that she is moderately impaired in social interaction skills necessary to deal with coworkers and supervisors" (id.). Finally, Mr. Loftis and Dr. Valerio opined that she "is moderately limited in her ability to adapt to changes found in most work situations" (id.).

### III. Conclusions of Law

#### A. Standard of Review

This court reviews the final decision of the SSA to determine whether that agency's findings of fact are supported by substantial evidence in the record and whether the correct legal standards were applied. Elam ex rel. Golay v. Comm'r of Soc. Sec., 348 F.3d 124, 125 (6th Cir. 2003). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 241 (6th Cir. 2007) (quoting Cutlip v. Sec'y of Health & Human Servs., 25 F.3d 284, 286 (6th Cir. 1994)). While this is a deferential standard, it is not a trivial one; a finding of substantial evidence must "take into account whatever in the record fairly detracts from its weight." Abbott v. Sullivan, 905 F.2d 918, 923 (6th Cir. 1990). Nevertheless, the SSA's decision must stand if substantial evidence supports the conclusion reached, even if the record contains substantial evidence that would have supported an opposite conclusion. E.g., Longworth v. Comm'r of Soc. Sec., 402 F.3d 591, 595 (6th Cir. 2005). Accordingly, while this court considers the record as a whole in determining whether the SSA's decision is substantially supported, it may not review the case *de novo*, resolve conflicts in the evidence, or decide questions of credibility. See Bass v. McMahon, 499 F.3d 506, 509 (6th Cir. 2007); Garner v.

Heckler, 745 F.2d 383, 387 (6th Cir. 1984).

B. <u>Proceedings at the Administrative Level</u>

The claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." <u>Id.</u> at § 423(d)(3). In proceedings before the SSA, the claimant's case is considered under a five-step sequential evaluation process, described by the Sixth Circuit Court of Appeals as follows:

> 1) A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.
>
> 2) A claimant who does not have a severe impairment will not be found to be disabled.
>
> 3) A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the Regulations. Claimants with lesser impairments proceed to step four.
>
> 4) A claimant who can perform work that he has done in the past will not be found to be disabled.
>
> 5) If a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

<u>Cruse v. Comm'r of Soc. Sec.</u>, 502 F.3d 532, 539 (6th Cir. 2007)(<u>citing</u>, e.g., <u>Combs v. Comm'r of Soc. Sec.</u>, 459 F.3d 640, 642-43 (6th Cir. 2006)(en banc)); 20 C.F.R. §§ 404.1520(b)-(f),

416.920 (b)-(f). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work, but at step five of the inquiry ... the burden shifts to the Commissioner to identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity (determined at step four) and vocational profile. Jones v. Comm'r of Soc. Sec., 336 F.3d 469, 474 (6th Cir. 2003) (citing Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987)).

The SSA's burden at the fifth step of the evaluation process can be carried by relying on the Medical-Vocational Guidelines, otherwise known as "the grids," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. See Wright v. Massanari, 321 F.3d 611, 615-16 (6th Cir. 2003). Otherwise, the grids cannot be used to direct a conclusion, but only as a guide to the disability determination. Id.; see also Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir. 1990). In such cases where the grids do not direct a conclusion as to the claimant's disability, the SSA must rebut the claimant's *prima facie* case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert ("VE") testimony. See Wright, 321 F.3d at 616 (quoting Soc. Sec. Rul. 83-12, 1983 WL 31253, *4 (S.S.A.)); see also Varley v. Sec'y of Health & Human Servs., 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity ("RFC") for purposes of the analysis required at steps four and five above, the SSA is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. See 42 U.S.C. §§ 423(d)(2)(B), (5)(B); Foster v. Bowen, 853 F.2d 483,

13

490 (6th Cir. 1988).

C. <u>Plaintiff's Statement of Errors</u>

Plaintiff first challenges the ALJ's finding at the third step of the sequential evaluation, that she does not meet the criteria of Listing 12.05C, the listing for intellectual disability (formerly referred to as mental retardation). "Listing 12.05C has four elements, derived from the introductory paragraph describing mental retardation and the additional elements listed under part C: (1) significantly subaverage general intellectual functioning; (2) deficits in adaptive functioning initially manifested during the developmental period, i.e. before age 22; (3) a valid verbal, performance, or full scale IQ of 60 through 70; (4) a physical or other mental impairment imposing an additional and significant work-related limitation of function." <u>Justice v. Comm'r of Soc. Sec.</u>, 515 Fed. Appx. 583, 587 (6th Cir. Feb. 22, 2013) (<u>citing</u> 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05C). Plaintiff contends that all four elements above are established on this record, and that the ALJ erred in finding that the fourth element is not established. The ALJ's decision leaves little room for dispute -- and indeed defendant does not dispute -- that plaintiff's current "significantly subaverage general intellectual functioning" and qualifying IQ score are established by the consultative examination report of Mr. Mark Loftis and Dr. Carolyn Valerio, Psy.D. (Tr. 430-34) The ALJ recited the results of tests administered during that examination, as follows:

> Mr. Loftis administered the Wechsler Adult Intelligence Scale IV and the claimant obtained a verbal comprehension IQ score of 70, a perceptual reasoning score of 75, a working memory score of 74, a processing speed score

14

> of 65 and a full-scale IQ score of 66. Mr Loftis opined her full-scale IQ score was in the extremely low range of general intelligence; that her verbal, perceptual, and working memory scores were in the borderline range; and her processing index score was in the extremely low range. He also administered the Wide Range Achievement Test-IV. The claimant's reading score revealed she read at the 3.5 grade level and her math abilities were at the 5.7 level as well. Mr. Loftis opined her scores were consistent with her being in special education and that she appeared to have a **functional level of literacy in reading and math** computation. He further opined she was not significantly delayed in most areas of adaptive functioning.

(Tr. 29) (emphasis in original)

In view of this report, there would appear to be room for dispute over whether plaintiff has proved the existence of adaptive functioning deficits, either currently or prior to the age of 22. Perhaps tellingly, Mr. Loftis and Dr. Valerio did not diagnose mild mental retardation, but "Intellectual functioning in the Extremely Low Range." (Tr. 433) See Peterson v. Comm'r of Soc. Sec., 552 Fed. Appx. 533, 539 (6th Cir. Jan. 21, 2014) ("Although an MMR diagnosis is not a necessary prerequisite to satisfy Listing 12.05, its absence is probative for a 12.05C determination.") (citing Cooper v. Comm'r of Soc. Sec., 217 Fed. Appx. 450, 452 (6th Cir. Feb. 15, 2007); but see Sheeks v. Comm'r of Soc. Sec., 544 Fed. Appx. 639, 641-42 (6th Cir. Nov. 20, 2013) ("[The claimant] notes that the ALJ's finding that he has borderline intellectual functioning, a lesser diagnosis than mental retardation, does not rule out the possibility of a finding of mental retardation. That is true, as the Commissioner concedes."). For his part, the ALJ found plaintiff's only severe impairment to be Borderline Intellectual Functioning (Tr. 26), and did not discuss plaintiff's developmental period other than to note that the two pages of school records in evidence show placement in "some

15

special education classes when she was in the seventh, eighth, and ninth grades."[2] (Tr. 30)

However, the ALJ did not find that the listing is unmet because of the lack of significant deficits in adaptive functioning. Rather, after reciting the diagnostic description of the mental retardation listing, he proceeded to address the requirements for demonstrating the severity of the impairment, contained in paragraphs A-D of Listing 12.05. As pertinent here, the ALJ found as follows:

> In terms of the requirements in paragraph C, they are not met because the claimant does not have a valid verbal, performance, or full scale IQ of 60 through 70 **and** a physical or other mental impairment imposing an additional and significant work-related limitation of function. Although the claimant had IQ scores between 60 and 70, she does not have a physical or other mental impairment imposing an additional and significant work related limitation of function.

(Tr. 30) Plaintiff argues that her pulmonary problems amount to a physical impairment that imposes additional and significant work-related limitations, citing the ALJ's determination that she should avoid strong fumes, excessive dust and temperature extremes in the workplace. (Tr. 31) She further cites the vocational expert's testimony that her past relevant jobs would not accommodate this limitation, and were unavailable solely for that reason. (Tr. 64-65)

        Plaintiff correctly observes that the Listing 12.05C criterion of an impairment "imposing an additional and significant work-related limitation of function" has been

---

[2]These special education records are the only evidence cited by plaintiff in support of her claim to onset of her impairment during her developmental period. (Docket Entry No. 14 at 19) However, such records, standing alone, have been deemed insufficient to establish onset during the developmental period. See Peterson, 552 Fed. Appx. at 540 (citing cases).

equated with an impairment that is "severe" at the second step of the sequential evaluation. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00A. Plaintiff contends that "[w]hen a finding is made that the claimant cannot return to her prior relevant work because of additional restrictions, the second prong of 12.05C is met." (Docket Entry No. 14 at 20) However, the language of § 12.00A, cited by plaintiff, refutes her argument here. The regulatory language emphasizes that a qualifying, additional impairment under Listing 12.05C must be severe as that term is defined in the regulations, i.e., it must "significantly limit[] your physical or mental ability to do basic work activities," 20 C.F.R. §§ 404.1520(c), 416.920(c). "If the additional impairment(s) does not cause limitations that are 'severe' as defined in §§ 404.1520(c) and 416.920(c), we will not find that the additional impairment(s) imposes 'an additional and significant work-related limitation of function,' *even if you are unable to do your past work because of the unique features of that work.*" 20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 12.00A (emphasis supplied). While the ALJ did impose restrictions against *strong* fumes, *excessive* dust, and *extreme* temperatures, he was unequivocal in finding plaintiff's alleged pulmonary impairment to be nonsevere based on the lack of any diagnosis or prescribed treatment of same by plaintiff's medical providers,[3] as well as plaintiff's insistence on continuing to smoke cigarettes against medical advice. (Tr. 28) There is no inconsistency in this finding of minimal work restrictions resulting from a nonsevere impairment:

> [A] Step Two analysis is distinct from the ALJ's obligation to consider the impact of Plaintiff's non-severe impairments in addition to and in conjunction with Plaintiff's severe impairments in assessing Plaintiff's RFC. A non-severe

---

[3]The consultative examiner, Dr. Keown, did diagnose "COPD of very mild severity," after reporting normal results on her physical examination and the fact that plaintiff had "no plans to stop[] tobacco at this time." (Tr. 329-31)

> impairment is defined by the regulations as an impairment that "does not *significantly* limit [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a) (emphasis added). Notably, the definition contemplates that non-severe impairments may very well impose *some* type of limitation on basic work activities; accordingly, an ALJ's conclusion that an impairment is non-severe is not tantamount to a conclusion that the same impairment—either singly or in combination with a claimant's other impairments—does not impose *any* work-related restrictions.

Katona v. Comm'r of Soc. Sec., 2015 WL 871617, at *6 (E.D. Mich. Feb. 27, 2015) (internal citations omitted).

In sum, the undersigned concludes that substantial evidence supports the ALJ's determination that plaintiff's intellectual impairment did not meet or equal all of the criteria of Listing 12.05.

Plaintiff's second and final argument is that the ALJ failed to give proper consideration to the opinion of Dr. Michael T. Cox, to whom plaintiff was referred by her attorney for an examination and assessment of work-related limitations. (Tr. 419-24) After noting that Dr. Cox was not a treating physician, but rather a physician hired "through attorney referral and in connection with an effort to generate evidence for the current appeal," the ALJ discounted the physician's assessment because it was based solely on plaintiff's subjective complaints and reported limitations, rather than any abnormal findings on physical examination. (Tr. 32-33) Indeed, Dr. Cox did not find any abnormality upon examining plaintiff, other than a mild limitation in her lumbar spine range of motion. (Tr. 419-20) Moreover, he diagnosed plaintiff with "COPD based on historical parameters," "[l]eft leg weakness subjectively, etiology historically seems to be related to some lumbar degenerative disc disease based on the patient's history," and "post-fracture arthritic changes

in the left forefoot." (Tr. 420)  He then opined that plaintiff has significant limitations due to left foot pain from osteoarthritis and "left leg weakness related to a presumed back problem." (Tr. 422)  Contrary to plaintiff's argument that the ALJ made the "unsupported assumption" that Dr. Cox's opinion is not based on objective evidence (Docket Entry No. 14 at 22), the undersigned must agree with the ALJ that the content and language of Dr. Cox's examination report and assessment speaks for itself in terms of being based much more on plaintiff's subjective reports than any objective findings.  In addition, Dr. Cox's reliance on plaintiff's report of significant pain from an old foot fracture is contradicted by the report of Dr. Keown that plaintiff "ambulates briskly without an assistive device," "showed no difficulty with toe lift and heel walk, exercises, tandem step, and one-foot stand," and generally had an "[u]nremarkable evaluation of lower extremities and feet."  (Tr. 331)  Accordingly, the undersigned finds that substantial evidence supports the ALJ's weighing of Dr. Cox's opinion.

For the reasons given above, plaintiff's challenges to the ALJ's decision are without merit.  That decision is supported by substantial evidence on the record as a whole, and should therefore be affirmed.

### IV.  Recommendation

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment on the administrative record be DENIED and that the decision of the SSA be AFFIRMED.

Any party has fourteen (14) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court.  Any

party opposing said objections shall have fourteen (14) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. Thomas v. Arn, 474 U.S. 140 (1985); Cowherd v. Million, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

ENTERED this 19th day of May, 2016.

s/ John S. Bryant
JOHN S. BRYANT
UNITED STATES MAGISTRATE JUDGE